## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Docket No. 2:15-cr-55-NT |
| | ) | |
| | ) | |
| GREGORY OWENS, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS AND DISMISS

Defendant Gregory Owens is charged with Interstate Domestic Violence in violation of 18 U.S.C. § 2261(a)(1), (b)(2) and Discharge of a Firearm During and in Relation to a Crime of Violence in violation of 18 U.S.C. 924(c)(1)(A)(iii). This matter comes before the Court on the Defendant's motion to dismiss (ECF No. 40) and two motions to suppress (ECF Nos. 41 & 43).[1]  I have considered the testimony, evidence, and arguments presented at the hearing on September 9, 2015, as well as both parties' supplemental briefs. For the reasons stated below, the Defendant's motions are **DENIED.**

### FINDINGS OF FACT

The charges against the Defendant arise out of a shooting that occurred in the early hours of December 18, 2014 at a home on Hillview Avenue in Saco, Maine. I

---

[1]     The Defendant initially filed three motions to suppress but later withdrew his motion to suppress DNA test results (ECF No. 42). *See* Def.'s Suppl. Brief 6 (ECF No. 61).

glean these facts from the testimony of Officer Randy Dyer, Sergeant Marc Beaudoin, and Detective Frederick Williams and from the exhibits offered by the parties.

On the night of the shooting Steven and Carol Chabot, the owners of the home, were hosting their longtime friend Rachel Owens, the Defendant's wife. At 2:47 a.m., Steven Chabot called 911 to report a shooting in his home. Def.'s Ex. B ¶ 3 (ECF No. 54-1). When officers arrived, they learned that both Steven Chabot and Rachel Owens had been shot. Def.'s Ex. B ¶ 3. Carol Chabot was found unharmed. Def.'s Ex. B ¶ 3.

During the ensuing investigation at the Chabot residence, Rachel Owens was unresponsive, but Steven Chabot was able to speak. He told investigators that he had heard a noise coming from downstairs while he was in bed with his wife in their second floor bedroom. Def.'s Ex. B ¶ 5. When they went into the hallway to investigate, Steven Chabot saw an individual walking up the stairs holding a gun. Def.'s Ex. B ¶ 5. Steven Chabot described the subject as 5' 9" tall with a medium build and wearing all black clothing, including a black ski mask. Def.'s Ex. B ¶ 5.

Carol Chabot did not see the subject but saw the look of fear on her husband's face when he saw the individual ascending the stairs. She ran to a nearby bedroom to hide. The intruder initially tried—but failed—to gain entry into the bedroom where Carol Chabot had barricaded herself. Thereafter, Carol Chabot heard Rachel Owens screaming, followed by gunshots and moaning. Def.'s Ex. B ¶ 6. After shooting Rachel Owens three times, the intruder attempted to enter the locked bedroom where Steven Chabot was hiding. Def.'s Ex. B ¶ 5. The intruder fired several shots through the

bedroom door, striking Steven Chabot in the torso three times. Def.'s Ex. B ¶¶ 3-5. The intruder then fled, and Steven Chabot called the police. Def.'s Ex. B ¶ 5.

The police discovered several 9mm bullet castings, large spots of what appeared to be blood on a carpet, and signs of forced entry through a glass door that had been broken in the back of the Chabot's garage. Def.'s Ex. B ¶ 4. The police also discovered and took casts of boot prints at the scene. Def.'s Ex. A ¶ 10 (ECF No. 54).

At approximately 4:20 a.m., Detective Fred Williams of the Saco Police Department contacted the Londonderry Police Department for assistance in locating the Defendant. Officer Randy Dyer and Officer Keith Lee of the Londonderry Police Department were dispatched to the Defendant's residence to check if the Defendant's motor vehicles were present. They were specifically instructed not to make contact with the Defendant. Officer Lee, who had a personal relationship with the Defendant, was aware that the Defendant possessed firearms, and as a result, the officers approached the home cautiously.

The Defendant's split-level house is at the end of a dead-end street lined with several other houses. There are no streetlights on the road. Officers Dyer and Lee arrived at 5:24 a.m., parked at the far end of the street, and walked toward the Defendant's home.

Photographs of the Defendant's house and yard, admitted as Defendant's Exhibits 3 and 4, show that the house sits back about forty feet from the street. As one faces the house from the street, on the ground floor of the left side of the house is a garage. A driveway runs from the garage straight to the street. A paved walk

connects the driveway to the Defendant's front steps. At the foot of the driveway there is a mulched bed containing a mailbox and several bushes. To the left of the driveway is a side yard with a row of evergreen trees that sit back approximately 10-20 feet from the street and run parallel to the street.  In front of the evergreen trees is a lawn area. There are no fences or signs posted on the Defendant's property.

As Officers Dyer and Lee approached they noticed lights on in the Defendant's house. At this point, a New Hampshire state trooper arrived with his cruiser's blue lights on. The officers stopped the trooper and asked him to turn off his lights.  Around this time, the lights in the Defendant's home went off.

The police observed a vehicle parked on the upper part of the driveway with its nose facing the garage. At this point, Officer Dyer crossed the lawn in front of the evergreen trees, walked toward the vehicle, touched the hood, and determined that the engine was warm. He then retreated back to the evergreen trees, joined Officer Lee and the state trooper, and they all returned to their vehicles to sit watch.

Between around 6:00 and 6:30 a.m., the Defendant left his home and went to a nearby Circle K gas station. The officers followed and made contact with the Defendant at the gas station where they informed him that his wife had been shot. The officers noticed what appeared to be blood on the Defendant and along the driver's side armrest and steering wheel of the Defendant's vehicle. Def.'s Ex. B ¶ 8. Around this time, Sergeant Marc Beaudoin of the New Hampshire State Police arrived at the Circle K gas station. By this time, Sergeant Beaudoin had learned that two people had been seriously injured in a shooting in Saco and that there was a

suspect in Londonderry. Sergeant Beaudoin understood that the authorities in Maine did not know if the victims were going to live or die.

The Defendant agreed to go to the Londonderry Police Department for questioning. Sergeant Beaudoin, along with Sergeant Nicholas Pinardi of the Londonderry Police Department, conducted a recorded Mirandized interview. When Sergeant Beaudoin told the Defendant that his wife had been shot, the Defendant asked about his wife's status. When told his wife was alive but in surgery, the Defendant briefly lost his composure and then asked about her prognosis. The Defendant then asked what had happened, and Sergeant Beaudoin told the Defendant that the police were investigating. Def.'s Exhibit 1A, 2:29-3:08.

The Defendant told Sergeant Beaudoin that Carol Chabot had picked Rachel Owens up on Monday, December 15th to take her to Maine for a visit.  His wife had been staying with the Chabot's—who are close family friends—for a few days.  When asked about his whereabouts over the last day, the Defendant stated that:

- He woke up early on December 17th when the automatic light in his living room went on at 5:30 a.m. Def.'s Ex. 1A, 7:48-7:54.

- He worked throughout the day in his home office on a proposal for the Ukrainian government. Def.'s Ex. 1A, 8:00-8:20.

- He left to grab a coffee from the gas station at around 3:30 or 4:00 in the afternoon. Def.'s Ex. 1A, 8:35-8:44.

- He spoke with his wife on the phone at around 9:15 p.m. Def.'s Ex. 1A, 12:04-12:10.

5

- He continued to work on the project and then left his house between 12:30 a.m. and 12:45 a.m. to grab a diet soda and a pack of cigarettes from a nearby gas station. Def.'s Ex. 1A, 8:56-9:04.

- When he returned home, he worked for a few minutes. He then tried to go to sleep but got up to fix something in his project at about 2:30 or 2:45 a.m.  Def.'s Ex. 1A, 10:30-10:44.

- Later that morning, he woke up early to check his email for work and then drove down to get a cup of coffee. Def.'s Ex. 1A, 9:14-9:36.

Later on in the interview, the Defendant gave a somewhat different account of what happened in the evening of December 17th into the early morning of December 18th.

- He went to bed around 11:45 p.m. or midnight but woke up around 2:30 a.m. to do some work on his computer. Def.'s Ex. 1A, 39:16-39:50.

- He went to Dunkin Donuts early in the morning on December 18th between 4:15 a.m. and 4:45 a.m. to get a coffee and donuts. Def.'s Ex. 1A, 40:06-41:16.

Sergeant Beaudoin left the interview around this point and Detective Jeff Cook of the Saco Police Department eventually took his place. The Defendant told Detective Cook about his midnight trip to the Circle K gas station and his early morning trip to Dunkin Donuts. Def.'s Ex. 1A, 1:24:56-1:27:18.

During the interview, Sergeant Beaudoin asked whether the Defendant owned any firearms, and the Defendant said he had an entire arsenal at his house. Def.'s Ex. 1A, 18:10-18:14. The Defendant explained that he had a rack of pistols because

he trains with departments that work with 9mm handguns, GLOCK .40 handguns, and the new M&P .40. Def.'s Ex. 1A, 18:18-18:32. Sergeant Beaudoin then specifically asked the Defendant whether he owned any 9mm handguns, and the Defendant said that he owned two. Def.'s Ex. 1A, 19:40-19:44. Sergeant Beaudoin was aware that 9mm casings were recovered at the scene of the crime.

The officers also inquired about the amount of time it normally takes the Defendant to travel to Maine. The Defendant said that it normally takes him 2 hours and 10 minutes to drive from his home in Londonderry to Saco and it would take him longer if the weather was poor. Def.'s Ex. 1A, 25:28 – 25:46. However, the Defendant had told the officers earlier in the interview that it takes him about 90 minutes to travel to his wife's parents' home on Portland Road in Saco. Def.'s Ex. 1A, 6:10-6:26.

At one point during the interview, Sergeant Beaudoin pointed out that the Defendant had blood on his hand. Def.'s Ex. 1B, 10:58-11:00. The Defendant said he had cut his hand on a glass and that the broken glass was in the trash at his home. Def.'s Ex. 1B, 11:00-11:06. The officers later obtained the Defendant's consent to swab his hand for DNA testing and did in fact take a sample.[2] Def.'s Ex. 1B, 41:46-42:22.

---

[2]     In his motion to suppress search warrants, the Defendant argued that his consent to provide a DNA sample was involuntary because the Defendant "was in custody" and not aware that he was the target of an investigation. *See* Def.'s Mot. to Suppress Search Warrants 10. Although it is the Government's burden to prove that consent was voluntary, *United States v. Romain*, 393 F.3d 63, 69 (1st Cir. 2004), this issue was not addressed at the suppression hearing. However, a review of the video recordings establishes that the Defendant's consent "was voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). In the video, Sergeant Beaudoin straightforwardly asked about obtaining a swab of the Defendant's mouth for DNA and a swab of his hand. The Defendant then orally provides consent for both searches. *See* Def.'s Ex. 1B 10:56-11:08.

After the interview ended, Sergeant Beaudoin and Detective Cook drove to the State Police Barracks in Bedford, New Hampshire to photograph the Defendant's vehicle. Def.'s Ex. A ¶ 15. While taking pictures, Detective Cook observed blood on the steering wheel and driver's side door near the handle and noticed a pair of black boots in the back seat. Def.'s Ex. A ¶ 15.

Later that day, the officers reviewed the surveillance videos from the Circle K gas station and Dunkin Donuts. The Defendant was at the Circle K gas station at 12:11 a.m. and Dunkin Donuts at approximately 4:50 a.m. Def.'s Ex. A ¶ 16; Def.'s Ex. C ¶ 15 (ECF No. 54-2). In both surveillance videos, the Defendant was wearing dark clothing and dark boots similar to those in the Defendant's vehicle. Def.'s Ex. A ¶ 16. The Defendant was wearing different clothing when he was interviewed by the police. Def.'s Ex. A ¶ 16. Based on this, Sergeant Beaudoin suspected that the Defendant changed his clothing at his home after getting home from Dunkin Donuts. Def.'s Ex. A ¶ 16.

Detective Williams had responded to the scene of the shooting in the early morning hours of December 18th and had transported Carol Chabot back to the Saco Police Department. Thereafter, Detective Williams received periodic updates from his supervisor, Detective Sergeant Huntress, who was directing the investigation in Maine and receiving information from a number of different officers working on the case in both Maine and New Hampshire. Detective Williams drafted an affidavit outlining the investigation that was taking place in Maine.

Detective Williams's affidavit includes a description of the shooter provided by Steven Chabot. This description was relayed to Detective Williams by Detective Granata who was with the shooting victims at the hospital. The affidavit does not include a description from Carol Chabot because she never saw the intruder. Detective Williams drafted his initial affidavit before Rachel Owens could be interviewed by Detective Granata.[3] Detective Williams also did not include in his affidavit the fact that blood was not found at the point of entry into the Chabot's home and that the intruder was wearing gloves. Detective Williams testified that he did not include this information because he was not aware of it until months later.

Detective Williams's affidavit included information regarding the surveillance videos and travel times between Maine and New Hampshire. In paragraph 11 of his affidavit, Detective Williams stated that the Defendant was at Dunkin Donuts at 4:15 a.m. Def.'s Ex. B ¶ 11. Detective Williams testified that he later learned that the Defendant was at Dunkin Donuts at 4:50, and he attributes the error to a miscommunication over the telephone. In paragraph 12, Detective Williams wrote that the Circle K gas station was 96 minutes away from the Chabot's home on Hillview Avenue in Saco and that the Dunkin Donuts was 88 minutes away from the Chabot's house. Def.'s Ex. B ¶ 12. Detective Williams used Google Maps to make these calculations. Detective Williams was aware that the Defendant had said it normally takes him 2 hours and 10 minutes to get from his home in Londonderry to Saco. At

---

[3]     Detective Williams testified that he did not have information from Detective Granata's interview of Rachel Owens at the time he drafted any of his affidavits in support of search warrants.

some point after he drafted this affidavit, Detective Williams learned that the Defendant's Transpass was not used on the night of the shooting.

Detective Williams finished his affidavit early in the morning of December 18th and emailed it to Sergeant Beaudoin. Sergeant Beaudoin attached Detective Williams's affidavit to his own search warrant affidavit as an appendix. At the time Sergeant Beaudoin drafted his affidavit, he knew that both shooting victims were still alive but was not sure whether they were going to make it. Sergeant Beaudoin was unaware that blood was not found at the point of entry into the Chabot's home. He also did not know about any reports describing the intruder as wearing gloves. He did, however, indicate in his affidavit that entry into the Chabot's house had been made by breaking a window and that the Defendant had a cut on his hand at the time of the interview.

Sergeant Beaudoin finished drafting and submitted his application for a warrant to search the Defendant's residence and vehicle around 10:15 p.m. on December 18, 2014. He received a fax of the warrant signed by a New Hampshire judge at 10:43 p.m. on December 18th. On December 19, 2014, the New Hampshire State Police conducted a search of the Defendant's residence and seized the Defendant's vehicle so that it could be transported to Maine to be searched.

On December 18, 2014, a Maine District Court Judge signed an anticipatory search warrant for the Defendant's vehicle, which was then still located in New Hampshire. *See* Def.'s Ex. B. This warrant was supported by Detective Williams's December 18, 2014 affidavit, and it authorized the search of the vehicle in Maine once

the Maine authorities were allowed to take possession of the vehicle. Def.'s Ex. B. The Defendant's vehicle was searched on December 22, 2014 at the Maine State Police Crime Laboratory.

On December 23, 2014, a Maine District Court Judge signed a search warrant for 16 electronic items that had been seized from the Defendant's home. Def.'s Ex. C. This warrant was supported by Detective Williams's December 18th affidavit, which added the fact that the Defendant's home in New Hampshire had been searched on December 19th and clarified the mistake in earlier affidavits concerning the time the Defendant was at Dunkin Donuts on December 18th. Def.'s Ex. C ¶ 15.

On January 16, 2015, a Maine District Court Judge signed a search warrant for the Defendant's external hard drive and black Swiss Army carry-on laptop travel bag. Def.'s Ex. D (ECF No. 54-3). This warrant was supported by the affidavit prepared by Detective Williams that had been further updated to note that the Maine State Police Crime Laboratory had matched the Defendant's DNA to DNA found at the scene of the shooting, that the clock on the Defendant's computer had been tampered with, and that the Defendant had been involved in an extra-marital affair since 2008. Def.'s Ex. D. ¶¶ 17-18, 22. The affidavit also stated that 15 rounds of the same exact 27 year-old 9mm ammunition was found in the Defendant's home and that the black boots seized from the backseat of the Defendant's car had the same exact size and tread of the foot impressions taken from the scene of the crime. Def.'s Ex. D. ¶¶ 16-17.

Finally, on January 20, 2015, Magistrate Judge John Rich III issued a search warrant for a buccal swap of the Defendant's cheek. Def.'s Ex. E (ECF No. 54-4). This warrant was based on an affidavit prepared by Special Agent Pamela Flick.

## DISCUSSION

The Defendant argues that: (1) his indictment should be dismissed on double jeopardy grounds; (2) Officer Dyer's touch of the Defendant's vehicle in his driveway was an unconstitutional search; (3) each search warrant lacks probable cause on its face; and (4) he is entitled to a *Franks* hearing to contest each search warrant issued in this matter because of alleged false statements and material omissions contained in affidavits supporting the warrants. I address each argument in turn.

## I.   Motion to Dismiss the Indictment

"[P]rosecutions undertaken by separate sovereign governments, no matter how similar they may be in character, do not raise the specter of double jeopardy as that constitutional doctrine is commonly understood." *United States v. Guzman*, 85 F.3d 823, 826 (1st Cir. 1996). "When a defendant in a single act violates the peace and dignity of two sovereigns by breaking the laws of each, he has committed two distinct offenses." *Heath v. Alabama*, 474 U.S. 82, 88 (1985) (internal quotation marks omitted). This doctrine is not an exception to double jeopardy, but rather "a manifestation of the maxim that where a defendant violates the laws of two sovereigns, he commits separate offenses." *United States v. Angleton*, 314 F.3d 767, 771 (5th Cir. 2002).

There is a very limited exception to the dual sovereign rule created by *Bartkus v. Illinois*, 359 U.S. 121, 124 (1959). The *Bartkus* exception applies only where "one sovereign so thoroughly dominates or manipulates the prosecutorial machinery of another that the latter retains little or no volition in its own proceedings." *Guzman*, 85 F.3d at 827. To fall within this exception, a defendant bears an entry-level burden of producing "some evidence" that "one sovereign was a pawn of the other, with the result that the notion of two supposedly independent prosecutions is merely a sham." *Id*. The fact that two sovereigns cooperated in conducting an investigation is insufficient to invoke this limited exception. *Id*. at 828 ("Cooperative law enforcement efforts between independent sovereigns are commendable, and, without more, such efforts will not furnish a legally adequate basis for invoking the *Bartkus* exception to the dual sovereign rule.").

The Defendant argues that his indictment must be dismissed because he is facing charges stemming from the same incident in state court.[4] He contends that this case falls under the *Bartkus* exception because "the investigation was conducted by both state and federal authorities working together and prosecutorial decisions were made at approximately the same time." Def.'s Mot. to Dismiss 4 (ECF No. 40). The Defendant notes that the discovery in the state and federal cases is identical and that "[c]ounsel has a good faith basis to believe that the prosecutorial entities are at a minimum working together on this matter." Def.'s Reply 2 (ECF No. 50).

---

[4]      The State is charging multiple counts of aggravated attempted murder, attempted murder, elevated aggravated assault, aggravated assault, burglary, and criminal mischief.

Even assuming for the purposes of argument that jeopardy has attached in the state court matter, the Defendant has presented insufficient evidence to meet the entry-level showing required by *Bartkus*. Accordingly, his motion to dismiss on this basis fails.[5]

## II.   Officer Dyer's Touching of the Defendant's Vehicle

The Defendant argues that Officer Dyer performed an unconstitutional search when he entered the Defendant's driveway and touched the Defendant's vehicle to determine whether it had been driven recently. Def.'s Mot. to Suppress Search of Vehicle 3-4 (ECF No. 43). The Government argues that a search did not occur because the Defendant's driveway was not within the curtilage of his home.[6] Gov.'s Suppl. Brief 3-5 (ECF No. 62).

### A. The Curtilage Question

At the Fourth Amendment's " 'very core' stands 'the right of [an individual] to retreat into his own home and there be free from unreasonable governmental intrusion.' " *Florida v. Jardines*, 133 S. Ct. 1409, 1414 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Under the Fourth Amendment, the curtilage—or the area "immediately surrounding and associated with the home"—is considered part of the home itself. *Id.* After all, the paramount protection provided to

---

[5]     The Defendant also urges the Court to dismiss his indictment because the Government's interest in the matter has been extinguished by the more serious charges brought in state court. This argument fails as well. *See Heath v. Alabama*, 474 U.S. 82, 93 (1985) (rejecting an interest-based approach and noting that "[a] [sovereign's] interest in vindicating its sovereign authority through enforcement of its laws by definition can never be satisfied by another [sovereign's] enforcement of *its* own laws.").

[6]     Alternatively, the Government contends that the search was justified by exigent circumstances. I do not reach this argument.

the home under the Fourth Amendment would be essentially hollow if the government "could stand in a home's porch or side garden and trawl for evidence with impunity." *Id.*

Courts generally utilize four factors, known as the *Dunn* factors, in determining whether a location falls within the home's curtilage. These factors are:

> [1] [T]he proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.

*United States v. Brown*, 510 F.3d 57, 65 (1st Cir. 2007) (quoting *United States v. Diehl*, 276 F.3d 32, 38 (1st Cir. 2002)). Although "these factors are useful analytical tools," the guiding question is whether the location is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

Applying the *Dunn* factors here, the Defendant's vehicle was parked so that the hood of the vehicle was closest to the Defendant's garage, and Officer Dyer was near the garage when he touched the hood of the vehicle. The driveway is not enclosed in any way. Although the Defendant's home is partially surrounded by trees on the sides and back, nothing surrounds the driveway, which is completely open to the public. The Defendant used the driveway, at least on the night in question, to park his vehicle. It also serves as an access point to the garage and connects the street to the paved walk to the front door. The open nature of the driveway makes it unlikely that the Defendant would use the driveway for private activities. Finally, the

15

Defendant took no steps to protect his driveway from observation. There were no fences, dogs, or signs warning visitors away. The Defendant's entire driveway is easily observable to anyone passing by in the neighborhood. Although the Defendant lives at the end of a quiet dead-end street, the street is public and the driveway was not blocked or protected in anyway.

The First Circuit has remarked that "[i]f the relevant part of the driveway is freely exposed to public view, it does not fall within the curtilage . . . even [if] the relevant part of the driveway is somewhat removed from a public road or street, and its viewing by passersby is only occasional." *Brown*, 510 F.3d at 65-66 (driveway adjacent to the garage was not within the curtilage); s*ee also United States v. Roccio*, 981 F.2d 587, 591 (1st Cir.1992) (no expectation of privacy in a driveway exposed to public); *Pina v. Morris*, No. 09-11800-RWZ, 2013 WL 1283385, at *6 (D. Mass. Mar. 28, 2013) (driveway not considered within curtilage); *United States v. Sayer*, No. 2:11-cr-113-DBH, 2012 WL 2180577, at *2 (D. Me. June 13, 2012) (same); *United States v. Sparks*, 750 F. Supp. 2d 384, 389 (D. Mass. 2010), *aff'd*, 711 F.3d 58 (1st Cir. 2013) (parking area near defendant's apartment building not within curtilage). *But see Diehl*, 276 F.3d at 35, 40-41 (driveway was within the curtilage when the relevant part of the driveway was 500 feet from a discontinued town road in a remote rural area, the residents had posted "no trespassing signs" to discourage members of the public from entering, and the driveway was enclosed by a forest.").

Only the proximity factor of the *Dunn* framework favors the Defendant's position that the driveway where the car was parked was within the home's curtilage.

16

However, proximity to the home, standing alone "is not dispositive." *Brown*, 510 F.3d at 65 (citing *United States v. French*, 291 F.3d 945, 952 (7th Cir. 2002)); *see also United States v. Bausby*, 720 F.3d 652, 656-57 (8th Cir. 2013) (holding that enclosed yard within close proximity to the home was not within curtilage). I find that the Defendant's driveway was not intimately tied to the home itself.[7] Because the driveway was not within the curtilage, it does not fall "under the home's 'umbrella' of Fourth Amendment protection." *Dunn*, 480 U.S. at 301.

## B. The Property-Rights Baseline of the Fourth Amendment

The Defendant contends that the *Dunn* factors, and the decisions interpreting them, need to be read in light of the reemergence of the trespass analysis of the Fourth Amendment articulated in *United States v. Jones*, 132 S. Ct. 945 (2012) and *Florida v. Jardines*, 133 S. Ct. 1409 (2013). *Jardines* and *Jones* establish that a search occurs for Fourth Amendment purposes either when: (1) the government physically intrudes on a constitutionally protected area for the purposes of obtaining information, *Jones*, 132 S. Ct. at 949, or (2) the government violates a person's reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring).

### 1. *Florida v. Jardines*

---

[7]       I also note that the officers did not intrude upon the curtilage when they gathered on the side of the Defendant's property at the tree line near the public road. Defendant's photographic evidence plainly demonstrates that this location was farther from his home, devoid of any enclosures or signs, and completely open and accessible from the public road and the neighboring property. *See* Def.'s Ex. 4 & 5. Thus, any argument that this portion of the Defendant's property is within the curtilage fails. For the same reasons, Officer Dyer's line of approach, which cut across the Defendant's lawn, was also not an intrusion into the curtilage. *See* Def.'s Ex. 3; *see also United States v. Bausby*, 720 F.3d 652, 656-57 (8th Cir. 2013) (holding that enclosed yard within close proximity to the home was not within curtilage).

In *Jardines*, the Court held that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment." 133 S. Ct. at 1417-18. Significantly, the Court found that the search at issue occurred in the home's curtilage because the "front porch is the classic exemplar of an area adjacent to the home and to which the activity of home life extends." *Id*. at 1415 (internal quotation marks omitted).

Justice Scalia's opinion in *Jardines* did not discuss the *Dunn* factors, but there is no suggestion that *Dunn* has been overruled. Post-*Jardines*, other courts have applied these decisions in tandem. *See, e.g., Harris v. O'Hare*, 770 F.3d 224, 240-42 (2d Cir. 2014); *Bausby*, 720 F.3d at 656-57; *United States v. Apicelli*, No. 14-cr-012-01-JD, 2015 WL 2064290, at *5 (D.N.H. May 4, 2015); *United States v. Bain*, No. 14-cr-10115-IT, 2015 WL 666958, at **6-8 (D. Mass. Feb. 17, 2015).

While the Defendant argues that *Jardines* applies to the facts of this case, I disagree. Unlike the front porch at issue in *Jardines*, the Defendant's driveway was not within the home's curtilage. *See supra* sources cited in Part II. A.[8]

### 2. *United States v. Jones*

The Defendant also argues that Officer Dyer's conduct constituted a search under the framework set forth in *Jones* because "the touching of the vehicle

---

[8]      *Jardines* is also arguably distinguishable on the grounds that the scent of marijuana detected by the drug-sniffing dog emanated from inside the home itself where citizens enjoy heightened privacy protection. 133 S. Ct. at 1413; *see also Kyllo v. United States*, 533 U.S. 27, 40 (2001) (use of thermal-imaging device to observe heatwaves emitted from home unconstitutional); *Payton v. New York*, 445 U.S. 573, 590 (1980) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). The conduct at issue here did not lead to the discovery of any details originating from within the Defendant's home. Instead, Officer Dyer only gleaned information pertaining to the Defendant's vehicle. It is well-established that citizens have a significantly reduced expectation of privacy in their vehicles. *See California v. Carney*, 471 U.S. 386, 393 (1985).

constitute[d] a trespass." Def.'s Mot. to Suppress Search of Vehicle 5. In *Jones*, the Court held that a search occurred when law enforcement physically intruded on the defendant's constitutional "effect"—his vehicle—by attaching a GPS device to it. 132 S. Ct. at 949 ("The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."). Thus, under *Jones*, a trespass combined with "an attempt . . . to obtain information" constitutes a search. *Jones*, 132 S. Ct. at 951 n.5.

The Defendant has not cited to any law extending *Jones* to the limited type of search at issue here. The conduct at issue in *Jones*—mounting a GPS device to the undercarriage of the defendant's car for 28 days—is far more physically intrusive than Officer Dyer's momentary contact with the exterior of the hood of the Defendant's vehicle. Indeed, it is a stretch to describe this type of momentary contact with the outside of an inanimate object as an "intrusion" upon the Defendant's effect. I do not believe that *Jones* extends this far.[9]

---

[9]    My conclusion is consistent with other pre-*Katz* trespass-based Supreme Court decisions. *Compare Silverman v. United States*, 365 U.S. 505, 506-09 (1961) (unconstitutional search occurred when the police inserted a microphone "into a crevice extending several inches into the party wall, until the [microphone] hit something solid that acted as a very good sounding board," because "eavesdropping was accomplished by means of an unauthorized physical penetration into the premises occupied by the [defendants]"), *with Goldman v. United States*, 316 U.S. 129, 135-36 (1942) (placing a detectaphone against an office wall in order to listen to conversations taking place in the office next door did not violate the Amendment), *overruled in part by Katz v. United States*, 389 U.S. 347 (1967); s*ee also New York v. Class,* 475 U.S. 106, 114-15 (1986) (momentary reaching *into the interior* of a vehicle did constitute a search); *Clinton v. Virginia*, 377 U.S. 158, 158 (1964) (Clark, J., concurring) (per curiam) (insertion of an electronic device into a wall with a tack constituted a physical intrusion into the home).

As a result, even considering the police conduct here in light of the Supreme Court's recent decisions in *Jardines* and *Jones*, I find that there was no search when Officer Dyer walked up to the Defendant's vehicle and placed his hand on the exterior of its hood to determine whether it had been driven recently.

## III.  Search Warrants

The Defendant next contends that each search warrant lacked probable cause on its face and that he is entitled to a *Franks* hearing because of false statements and material omissions contained within the affidavits supporting the warrants. Def.'s Mot. to Suppress Search Warrants 4, 10 (ECF No. 41). The Government argues that each search warrant is supported by probable cause and that the Defendant has failed to make the required preliminary showing for a *Franks* hearing. Gov.'s Consolidated Obj. to Def.'s Mot. to Suppress 7 (ECF No. 47).

### A.  Facial Sufficiency of the Warrants

"A search warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause to search." *United States v. Graf*, 784 F.3d 1, 7 (1st Cir. 2015) (citation and internal quotation marks omitted). A warrant application "must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched—the so-called 'nexus' element." *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999).

In establishing the nexus element, the magistrate must consider the totality of the circumstances to determine whether "there is a fair probability that contraband

or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he facts presented to the magistrate need only warrant a man of reasonable caution to believe that evidence of a crime will be found." *Feliz*, 182 F.3d at 86 (citation and internal quotation marks omitted). "There is no requirement that the belief be shown to be necessarily correct or more likely true than false." *Id.* at 87. Because a magistrate's determination of probable cause "must be accorded great deference by reviewing courts," the duty of "a reviewing court is simply to ensure that the [magistrate] had a substantial basis for concluding that probable cause existed." *United States v. McMullin*, 568 F.3d 1, 6 (1st Cir. 2009) (citations and internal quotation marks omitted).

The Defendant first challenges the December 18, 2014 search warrant for the Defendant's home and vehicle issued in New Hampshire. This warrant was drafted on December 18, 2014 and contains both Sergeant Beaudoin and Detective Williams's affidavits. Among other things, Sergeant Beaudoin's affidavit established that: (1) law enforcement officers who arrived at the Defendant's home early in the morning on December 18, 2014 saw that the lights in the Defendant's home were going on and off; (2) the hood of the car parked in the Defendant's driveway was warm to the touch; (3) the Defendant changed his story regarding his whereabouts throughout the course of his interview with law enforcement; (4) the Defendant had blood on his hand when he was interviewed by the police and Sergeant Beaudoin knew that the intruder had gained entry into the Chabot's home by breaking a window; (5) the Defendant stated he had 9mm handguns at his home; (6) Detective Cook observed blood and black boots

21

inside the Defendant's car; (7) the surveillance video from the Circle K gas station showed the Defendant wearing dark clothing and dark boots before the shooting occurred; (8) the surveillance video from Dunkin Donuts on Route 102 at Mohawk Drive showed the Defendant arrive at 4:50 a.m. wearing dark colored clothing and dark boots; (9) the boots in the Defendant's vehicle appeared similar to the boots the Defendant was wearing in both surveillance videos, and (10) the Defendant was wearing a different jacket and boots when the police interviewed him later that morning. Def.'s Ex. A.

Detective Williams's affidavit repeated much of the information contained in Sergeant Beaudoin's affidavit, but it also added the following information: (1) officers found 9mm bullet casings at the scene of the crime; (2) forced entry into the Chabot's home was made through a rear garage door and window; (3) Steven Chabot described the shooter as wearing all black clothing and a black ski mask; (4) Carol Chabot described the Defendant as having killed people in the army and said that he owned several weapons that he would show off after consuming alcohol; and (5) based on Google Maps, the Defendant would have been able to make it from the Circle K gas station in New Hampshire to the Chabot's house in Saco, Maine in 96 minutes and from the Chabot's house to Dunkin Donuts in New Hampshire in 88 minutes. Def.'s Ex. B. Both affidavits also referenced Defendant's story that he had been awake off and on throughout the early morning hours of December 18, 2014 working on a presentation, and Sergeant Beaudoin noted that the Defendant had sent and received several emails.

Based on all of this information, there was more than a fair probability that evidence of the crime would be found in the Defendant's home and vehicle.[10] For the same reasons, the later warrants were also supported by probable cause. The December 18, 2014 anticipatory search warrant for the Defendant's vehicle and the December 23rd search warrant for 16 of the Defendant's electronic items were both supported by an essentially identical version of Detective Williams's affidavit. Further, the January 16, 2015 search warrant for the Defendant's external hard drive, laptop, and laptop travel bag was supported by an updated version of Detective Williams's affidavit which contained significant additional evidence. Finally, in support of the January 20, 2015 warrant for a buccal swap, Special Agent Flick averred that preliminary testing showed a positive match between the Defendant's DNA and material taken from a swab of the area of the broken window at the Chabot's home. Each affidavit was supported by probable cause, and, accordingly, the Defendant's facial challenge fails.

### B. False Statements and Material Omissions

The Defendant also contends that he is entitled to a *Franks* hearing because the affidavits submitted in support of the warrant applications contained false statements and material omissions. Def.'s Mot. to Suppress Search Warrants 10. Additionally, the Defendant contends that both Sergeant Beaudoin and Detective

---

[10]    I would reach this same conclusion about the facial validity of the warrant even if I had excised the fact that the Defendant's hood was warm to the touch. The warm hood is relevant to establish that the Defendant was up and about in the early hours of December 18th. The video recording showing the Defendant at Dunkin Donuts at 4:50 a.m. serves that purpose as well.

Williams's affidavits omitted material information that, although not known to them individually, should be imputed to them under the collective knowledge doctrine.

Affidavits supporting search warrants are presumptively valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). This presumption is not absolute and a defendant may overcome the presumption during an evidentiary hearing known as a *Franks* hearing. *Id.* However, in order to be entitled to such a hearing, a defendant must first make two "substantial preliminary showings: (1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause." *United States v. Rigaud*, 684 F.3d 169, 173 (1st Cir. 2012) (citation and internal quotation marks omitted). If a party cannot establish both elements, then a *Franks* hearing is not warranted. *Id.* If a hearing is held, suppression of the evidence seized is justified if "the defendant proves intentional or reckless falsehood by preponderant evidence and the affidavit's creditworthy averments are insufficient to establish probable cause." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015).

An affiant is not required to include "every shred of known information . . . in a warrant affidavit." *Id.* However, in some situations "[a] material omission of information may . . . trigger a *Franks* hearing." *United States v. Castillo*, 287 F.3d 21, 25 (1st Cir. 2002). An omission only triggers a *Franks* hearing "if it is designed to mislead, or . . . made in reckless disregard of whether [it] would mislead, the magistrate in his appraisal of the affidavit." *Tanguay*, 787 F.3d at 49 (citation and internal quotation marks omitted). Moreover, the omitted material must nullify the

24

finding of probable cause when considered with the remainder of the affidavit. *Castillo*, 287 F.3d at 25 n.4 ("With an omission, the inquiry is whether its inclusion in an affidavit would have led to a *negative* finding by the magistrate on probable cause.").

Allegations of deliberate falsehoods or material omissions must be accompanied by an offer of proof, such as affidavits or sworn statements of witnesses, or their absence satisfactorily explained. *Franks*, 438 U.S. at 171; s*ee also United States v. Scalia*, 993 F.2d 984, 987 (1st Cir. 1993). Self-serving statements by the Defendant and arguments contained in briefs are insufficient. *See United States v. McDonald*, 723 F.2d 1288, 1294 (7th Cir. 1983). Here, in his motion to suppress the Defendant identified portions of the warrants' affidavits that he claimed were false and he pointed to several material omissions from the warrants' affidavits. He did not, however, provide any affidavits or sworn statements of witnesses. Despite the lack of a substantial preliminary showing, the Defendant was able to cross-examine both Sergeant Beaudoin and Detective Williams at an evidentiary hearing. At the close of the hearing, defense counsel indicated that there were additional discrepancies between recorded interviews and police reports, and that other material information could have been left out of the affidavits. Defense counsel indicated that additional live testimony was not needed to make that showing. I allowed the Defendant an opportunity to file a supplemental brief.

## 1. **Alleged False Statements and Material Omissions in the Beaudoin Affidavit**

The Defendant contends that the affidavit drafted by Sergeant Beaudoin on December 18, 2014 contains numerous false statements and material omissions.

### a. Paragraph 4's Reference to a "Homicide"

First, the Defendant claims that paragraph four of the Beaudoin affidavit is false and misleading because it refers to the crime as a homicide rather than an attempted murder. Def.'s Mot. to Suppress Search Warrants 5. Sergeant Beaudoin testified that he was initially informed that the police were looking for a homicide suspect in Londonderry and when he drafted the affidavit, he did not know whether the victims were going to live or die. Even assuming that Sergeant Beaudoin's statement was intentionally false, the statement would not have affected the probable cause analysis. *See Rigaud*, 684 F.3d at 173.

### b. Paragraph 7's Reference to Owens as a "Suspect"

In paragraph seven of his affidavit, Sergeant Beaudoin described the Defendant as a suspect. Def.'s Ex. A ¶ 7. I see nothing wrong with the affidavit's identification of the Defendant as a suspect. By the time the affidavit was submitted, the Defendant was clearly a suspect.

### c. Paragraph 10's Statement that Owens did not Ask What Happened to his Wife.

In paragraph 10 of his affidavit, Sergeant Beaudoin noted:

> After he signed the Miranda form, I informed Mr. Owens that his wife had been shot but that she was still alive and in surgery. He showed relief, but did not ask what had happened.

Def.'s Ex. A ¶ 10. The Defendant argues that this statement is false and that it is belied by the video recording of the interview of the Defendant, in which the

26

Defendant did ask about what happened to his wife. Def.'s Mot. to Suppress Search Warrants 6; Def.'s Suppl. Brief 6 (ECF No. 61).

On the videotape, after the Defendant signs the *Miranda* Form, he asks, "status of my wife?" Sergeant Beaudoin states, "she's at the hospital right now." The Defendant states, "she's alive," and Sergeant Beaudoin confirms, "she's alive." The Defendant leans back, loses composure for a few seconds, and then asks, "prognosis?" Sergeant Beaudoin states: "We're not sure right now. She's still in surgery. But she is still alive right now." The Defendant then asks: "Steve? Carol?" Sergeant Beaudoin states: "Right now he is still alive too, and he is also in surgery." The Defendant then asks: "Any idea what happened?" Sergeant Beaudoin then explains that the police are investigating. The interview then goes on into different topics, and the Defendant, although emotional from time to time in the interview, does not inquire further about what happened to his wife until about 75 minutes into the interview when Detective Cook joins, and the Defendant again asks: "Status of my wife?" About 130 minutes into the interview, the Defendant asks if the Maine Police know where his wife was shot.

Sergeant Beaudoin's statement that the Defendant did not "ask what happened" in Paragraph 10 of the Beaudoin affidavit is technically false. The Defendant did ask what happened to his wife just after the *Miranda* warning was given. At the suppression hearing, Sergeant Beaudoin explained that he meant that the Defendant's reaction was not as forceful as Sergeant Beaudoin expected. It is true that the Defendant did not ask follow up questions about what happened after

27

Sergeant Beaudoin initially explained that the police were still investigating. Sergeant Beaudoin's general impression that the Defendant did not react as forcefully as he would have expected is reasonable when assessed in context of the entire interview. Although the Defendant made several inquiries about his wife's status throughout the three-hour interview, he did not ask many questions about what had happened. I find that the statement in Paragraph 10 that the Defendant did not inquire about what happened to his wife is, at most, a reckless falsehood. But I also find that even excluding this misstatement, the creditworthy averments in the affidavit are sufficient to establish probable cause.

### d.  Missing Information about Blood and Gloves

The Defendant also contends that paragraph 10 omits two key facts: (1) that blood was not found in the vicinity of the window that was broken to gain entry into the Chabot's home; and (2) that Steven Chabot said the shooter was wearing gloves. Def.'s Mot. to Suppress Search Warrants 6. Sergeant Beaudoin credibly testified that he was unaware that blood was not found at the point of entry into the Chabot's home and that he could not recall ever hearing that the intruder was described as wearing gloves.[11] Even if I were to find that Sergeant Beaudoin intentionally or recklessly omitted these facts, their inclusion in the warrant would not extinguish probable cause.

---

[11]     The Defendant also faults Detective Williams's affidavit for leaving out this information. Detective Williams testified that he did not learn about the lack of blood at the point of entry until months after he drafted his affidavit. He also testified that he did not know that Steven Chabot had described the shooter as wearing gloves when he drafted his affidavit on December 18th, 2014. This testimony was also credible and I find no basis for concluding that either officer deliberately omitted this information.

### e. Paragraph 11's Reference to Firearms

The Defendant also argues that Sergeant Beaudoin mischaracterized how the Defendant spoke about his firearm collection in paragraph 11. The Defendant argues that he did not initially offer that he owned 9mm handguns until Sergeant Beaudoin specifically asked about that type of weapon. However, Sergeant Beaudoin's statement in his affidavit is fairly consistent with the video recording of his interview with the Defendant. Contrary to the Defendant's argument, the Defendant is the first person to mention 9mm handguns. The Defendant implies that he owns 9mm handguns because he says he trains with departments that use them. This then leads Sergeant Beaudoin to ask the Defendant directly whether he owns this type of weapon. The differences between Sergeant Beaudoin's account in his affidavit and the video recording of the interview are minor inconsistencies caused, at most, by negligence. Conduct that is negligent or the result of innocent mistake is not enough to warrant a *Franks* hearing. *Franks*, 438 U.S. at 171 ("Allegations of negligence or innocent mistake are insufficient."); *United States v. Soto*, 779 F. Supp. 2d 208, 223 (D. Mass. 2011) ("A showing of negligence or good faith factual error is insufficient to trigger a *Franks* hearing.").

### f. Paragraph 12's Reference to the Defendant Changing his Story

Finally, the Defendant suggests that Sergeant Beaudoin falsely claimed in paragraph 12 that the Defendant changed his story when he was interviewed by Detective Cook to include the fact that the Defendant went to Dunkin Donuts. Def.'s Ex. A ¶ 12. A review of the video recording confirms that the Defendant initially left

out the fact that he made a trip to Dunkin Donuts when he first explained his whereabouts to Sergeant Beaudoin and Sergeant Pinardi at the beginning of the interview. While going over his story again with Beaudoin and Pinardi, the Defendant mentions his trip to Dunkin Donuts for the first time. Although Sergeant Beaudoin was wrong about precisely when the Defendant's story changed, he was correct that it had changed. The Defendant's attempt to characterize this minor discrepancy as a false statement made intentionally or with reckless disregard for the truth is unpersuasive. At worst, the inconsistency between the video and the affidavit was a mistake, not an intentional or reckless act.[12]

## 2. Alleged False Statement and Material Omissions in Detective Williams's Affidavits

The Defendant further contends that the affidavits drafted by Detective Williams contain numerous false statements and material omissions.

### a. Paragraph 5's Description of Suspect

The Defendant attacks paragraph five of Detective Williams's affidavit because it describes the Defendant as wearing all black with a black ski mask and this "is not the same as the description of clothing that . . . Sergeant Beaudoin attributes to [the] Defendant at the time he [makes] contact with law enforcement." Def.'s Mot. to Suppress Search Warrants 7. I fail to see how this purported inconsistency can be

---

[12]    The Defendant also argues that paragraph 16 of Sergeant Beaudoin's affidavit incorrectly states that the Defendant was at Dunkin Donuts at 4:50 a.m. Def.'s Mot. to Suppress Search Warrants 6. This argument appears to be based on paragraph 11 of Detective Williams's affidavit which erroneously stated the Defendant was at Dunkin Donuts at 4:15 a.m. Detective Williams credibly testified that this error was the result of a miscommunication over the telephone. Further, Detective Williams's later affidavits clarify that the correct time is 4:50 a.m. *See* Def.'s Ex. C ¶ 15.

characterized in any way as false or misleading. It is not uncommon for a suspect to change clothes in an attempt to avoid detection.

### b.  Omission of Defendant's Estimate of Travel Time

Next, the Defendant faults Detective Williams's affidavit for failing to note that the Defendant estimated that it takes over two hours to travel from Londonderry to Saco. Def.'s Mot. to Suppress Search Warrants 7. In Paragraph 12 of his affidavit, Detective Williams includes the mileage and estimated travel times between pertinent points. Detective Williams testified that he used Google Maps to get the information. The Defendant claims that the omission was material because the shooting occurred at approximately 2:47 a.m. in Saco and the Defendant arrived at Dunkin Donuts in New Hampshire at 4:50 a.m. This claim is unconvincing. The most relevant time period is the objective fact of how long it takes to travel from Saco to Londonderry, not the Defendant's own self-serving version of how long the trip normally takes him.[13] Even if this information had been included in Detective Williams's affidavit along with the Google Maps calculations, this would not have impacted the finding of probable cause. A reviewing magistrate would certainly afford more weight to an objective estimate of the time it takes to complete the trip than the Defendant's own assessment.[14]

---

[13]    I would also note that the Defendant mentioned at the beginning of his interview that it takes him around 90 minutes to drive from his home to Rachel Owens's parents' home in Saco, Maine. It was only later in the interview that the Defendant stated that it takes him over two hours to reach Saco, Maine.

[14]    At some point in the investigation, Detective Williams was made aware that the Defendant's Transpass was not used on December 18, 2014. Detective Williams could not remember when he became aware of this information. The Defendant has not provided any evidence suggesting that this information was known by Detective Williams before he drafted his affidavits. Moreover, a reviewing

31

### c. Omission of Intruder's Order of Attack

At the suppression hearing and in his supplemental brief, the Defendant argued that Detective Williams omitted from his affidavit the fact that the intruder first went after Carol Chabot, not Rachel Owens. To the contrary, Detective Williams's affidavit specifically mentions the fact that the intruder first attempted to gain entry into the room where Carol Chabot was hiding. Def.'s Ex. B ¶ 6.

### d. Failure to Include Rachel Owens's Description of Intruder

The Defendant claims that by the time Detective Williams drafted his December 23, 2014 affidavit, Rachel Owens had provided a statement to Detective Granata describing the intruder as being dark skinned with wild hair. The Defendant contends that Detective Williams intentionally or recklessly omitted this material information.

Detective Williams testified that he was unaware of any such description by Rachel Owens. He testified that he could not remember when he reviewed Detective Granata's report but that it was after he had written all of his affidavits. Detective Williams also testified that he had spoken with Detective Granata in the weeks after the shooting, but that he did not know the exact date.

Defense counsel used the Granata report, marked for identification only as Defendant's Exhibit 9, to refresh Detective Williams's recollection. After handing the report to Detective Williams, defense counsel asked whether Detective Granata ever

---

judicial official could easily conclude that a defendant would be unlikely to use a Transpass en route to an attempted murder.

told Detective Williams that Rachel Owens described the intruder as having wild hair or dark skin, and Detective Williams indicated that he did not recall Detective Granata ever saying that. Defense counsel then asked to have the report back.

With this line of questioning, defense counsel left me with the impression that Detective Granata's report contained information that Rachel Owens had described the Defendant as having wild hair and dark skin. Defense counsel's line of questioning was reinforced by the Defendant's motion to suppress in which the Defendant states: "By the time Detective Williams authors this affidavit Rachel Owens has been interviewed and had indicated that she saw her attacker and her attacker was a dark skinned man who appeared to be Jamaican and had wild spiky hair. This fact is absent from the warrant application." Def.'s Mot. to Suppress Search Warrants 8. The Defendant takes the impression one step further in his supplemental brief where he states: "Detective Granata interviewed Rachel Owens again on December 19, 2015. At that time Mrs. Owens indicated that the shooter had 'wild looking hair' and that the intruder's skin and clothing and skin [sic] were dark. *See* Audio recording of 12/19/14 Interview with Rachel Owens." Def.'s Suppl. Brief 3. Although the Defendant cites the audio recording, he does not provide the recording or any evidence establishing that Rachel Owens did in fact describe the intruder as being dark-skinned with wild hair.

Defendant's Exhibit 9, which purports to be pages three and four of Detective Granata's report, recaps Detective Granata's interview with Rachel Owens on December 18th, but it does not state that Rachel Owens described her assailant as

dark skinned or Jamaican looking with wild, spiky hair. Ordinarily, an exhibit not in evidence should not be considered, however, where defense counsel has created a false impression about the Granata report, I think I am entitled, if not obligated, to correct the record.

The Government, in closing arguments, contested that Rachel Owens ever said anything about dark skin and spiky hair. In response, defense counsel stated that her notes indicated that Carol Chabot (who never saw the intruder) may have given that description. Given that the confusion on this issue was apparent at the hearing, the Defendant's failure to come forward with evidence speaks volumes.

I credit Detective Williams's testimony that Detective Granata never relayed to him information that Rachel Owens described the attacker as dark skinned or wild-haired. Since I conclude that Detective Williams did not possess the information, I find that he did not intentionally or recklessly omit it.

### e.  Omission of Key Facts of the Defendant's Affair

The Defendant also takes issue with Detective Williams's affidavit in support of the January 16, 2015 search warrant for the Defendant's external hard drive and laptop computer. In that affidavit, Detective Williams stated that the Defendant had been having an affair since 2008. The Defendant contends that Detective Williams omitted the key fact that Rachel Owens was aware of his affair. This argument is unavailing, as Detective Williams presented credible testimony that he never learned that Rachel Owens was aware of her husband's affair.

### 3.  Omissions of Information Known by Other Officers Under the Collective Knowledge Doctrine

34

In his supplemental brief, the Defendant identifies numerous "facts"[15] that he claims "pointed away from [his] involvement in the crime" and argues that these "facts" should have been included in the affidavits.[16] Def.'s Suppl. Br. 2. The Defendant contends that even though these facts were not known to the affiants, the information should be imputed to them under the collective knowledge doctrine. Def.'s Suppl. Brief 1-2. This doctrine, generally relied on by the prosecution, allows the "'collective knowledge possessed by . . . all the officers involved in the investigation'" to be used in determining whether probable cause or reasonable suspicion exists. *United States v. Brown*, 621 F.3d 48, 57 (1st Cir. 2010) (quoting *United States v. Winchenbach*, 197 F.3d 548, 555 (1st Cir. 1999)). In attempting to use this doctrine against the government, the Defendant contends that exculpatory

---

[15]     The Defendant points to the following "facts": 1) The first-responding officer's noting of a Nissan Pathfinder in the area of the crime scene; 2) Detective Granata's hospital interview of Rachel Owens in which she described the suspect as dark-skinned with wild hair and referred to the intruder as "they"; 3) an initial interview of Carol Chabot in which she stated that she had a lot of jewelry in the house and that her husband had important work computers; 4) a January 5, 2015 interview of a neighbor of the Chabot's who saw a dark-skinned jogger wearing boots in the neighborhood at around 2:30 a.m. on December 17, 2014; 5) emails recovered in late December which suggest that Defendant sent email in the early morning hours of December 18, 2014; 6) information about the credibility of the Defendant's business associate who told police that the Defendant had asked him to provide an alibi; 7) an officer's review of video on December 23, 2014 which did not show Defendant's car crossing two bridges into Maine on the night of the shootings; 8) information taken from video surveillance at a convenience store near the crime scene which showed two vehicles near that area at the time of the shooting neither of which were the Defendant's vehicle; and 9) information obtained from the lead investigator for the Saco Police on the morning of December 18th that both victims were expected to survive. Def.'s Suppl. Br. 2-4.

[16]     In his supplemental brief, the Defendant cites to different video and audio recordings, but he does not offer them as evidence. Despite the Defendant's failure to provide an offer of proof on these additional alleged omissions, I will address the Defendant's arguments on the omissions of information known by other officers under the collective knowledge doctrine.

information in the possession of any officer investigating the crime must be imputed to the affiant.

While it is true that the police cannot "insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity," *Franks,* 438 U.S. at 163 n.6, and while the same principle has also been applied to deliberate omissions, *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992), every fact known to any officer involved in an investigation does not have to be imputed to the affiant. Investigations like this one, involving a violent offender, unfold on multiple levels at a rapid pace. "An omission triggers the exclusionary rule only if it is 'designed to mislead, or . . . made in reckless disregard of whether [it] would mislead, the magistrate' in his appraisal of the affidavit." *Tanguay*, 787 F.3d at 49 (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). Thus, the doctrine recognized in *Franks* and *DeLeon* is wisely limited to *deliberate or reckless* material misrepresentations or omissions by non-affiants. *See, e.g., United States v. Miller*, No. 6:11-cr-00004, 2012 WL 1414853, at *4 (W.D. Va. Apr. 24, 2012), *aff'd*, 534 F. App'x 204 (4th Cir. 2013).

Moreover, "[b]ecause there is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the *Franks* test." *Tanguay*, 787 F.3d at 49. Information that is not within the personal knowledge of the affiant which has only "peripheral relevancy to the showing of probable cause" need not be included in an affidavit. *Rugendorf v. United States*, 376 U.S. 528, 532

(1964). If the rule were otherwise, law enforcement would be confronted with "endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit." *Colkley*, 899 F.2d at 301.

The Defendant has provided the court with a laundry list of "facts" that he claims should have been included in the warrants, but he fails to make the required showing that any of the information was omitted with the requisite intent to mislead or with reckless disregard for whether it would mislead. Even if I were to treat the Defendant's "facts" as intentionally or recklessly omitted, and assumed for the purposes of argument that all of the Defendant's facts were known by the police on December 18, 2014, the inclusion of this information would not have undermined the probable cause in any of the affidavits. The fact that a car different from those owned by the Defendant was seen in the vicinity of the Chabot house or that the Defendant's cars were not seen on surveillance videos taken from a convenience store and two bridges would not have defeated the probable cause set forth in any of the warrants. If this information had been included in the warrants, it would have been balanced by context. For example, the affiant would have explained that, although the Defendant's vehicles were not seen in the surveillance videos from the Sarah Long and Memorial Bridges, the police had not reviewed surveillance tapes from any other bridges, including the Interstate 95 bridge into Maine.

Similarly the Rachel Owens interview, in context, would not have undermined a finding of probable cause. Rachel Owens observed an intruder at night. According to Steven Chabot, the intruder was dressed in dark clothes wearing a dark ski mask.

37

Rachel Owens suffers from early onset dementia. She gave the description shortly after she had been shot in the head and endured hours of surgery. In context, this description has significantly less evidentiary value. Nor would the comment by Carol Chabot regarding jewelry and computers in the house have undermined probable cause, particularly since none of those items was taken.

The alleged emails sent by the Defendant during the early morning hours of December 18, 2014 would not nullify the showing of probable cause either, since an individual does not need to be at his home to send an email. Likewise, inclusion of the Chabot's neighbor's description of a dark-skinned jogger running in the neighborhood 24 hours before the shooting would not have negated probable cause. Even if all of this information had been included in the warrant affidavits prepared by Sergeant Beaudoin and Detective Williams on December 18, 2014, probable cause to search would still exist.

Finally, the Defendant fails to account for the time the information was learned and the evolving nature of the investigation. For example, the Defendant takes issue with marginally relevant credibility evidence about a co-worker who said that the Defendant had asked him to provide an alibi. But by January 16th, when the co-worker's information was used, Detective Williams's affidavit contained the additional evidence that the police had made a preliminary positive match between the Defendant's DNA and DNA found at the scene of the shooting, had discovered tampering with the clock on the Defendant's computer, and had learned that the Defendant was involved in an extra-marital affair. Assessed against the mounting

38

evidence contained in the later warrants, the inclusion of these later-learned facts clearly would not have influenced the probable cause analysis.

## CONCLUSION

For the reasons stated above, the Court **DENIES** the Defendant's motion to dismiss (ECF No. 40), **DENIES** the Defendant's motion to suppress search warrants (ECF No. 41), and **DENIES** the Defendant's motion to suppress search of vehicle in driveway (ECF No. 43).

SO ORDERED

/s/ Nancy Torresen
United States Chief District Judge

Dated this 23rd day of October, 2015.