# United States Court of Appeals
## For the First Circuit

---

No. 16-1945

UNITED STATES OF AMERICA,

Appellee,

v.

GREGORY OWENS,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. Nancy Torresen, U.S. District Judge]

---

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

---

Sarah A. Churchill, with whom Nichols & Churchill, P.A., was on brief, for appellant.

John M. Pellettieri, Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, with whom Sangita K. Rao, Attorney, Appellate Section, Criminal Division, John P. Cronan, Acting Assistant Attorney General, Criminal Division, Matthew S. Miner, Deputy Assistant Attorney General, Criminal Division, Halsey B. Frank, United States Attorney, Darcie McElwee, Assistant United States Attorney, and James W. Chapman, Assistant United States Attorney, were on brief, for appellee.

---

February 26, 2019

---

TORRUELLA, **Circuit Judge**. This is a case about a double life, an attempted uxoricide, and excellent police work. Defendant-Appellant Gregory Owens ("Owens") was convicted of interstate domestic violence in violation of 18 U.S.C. § 2261(a)(1) and (b)(2); and discharge of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii). He was sentenced to life in prison. On appeal, Owens challenges the sufficiency of evidence supporting his convictions, the reasonableness of his sentence, and the district court's denial of his pretrial motions seeking to suppress evidence and dismiss the indictment on double jeopardy grounds. After careful review, we find Owens's convictions supported by sufficient evidence, his sentence substantively reasonable, and the motions for suppression and dismissal properly denied. Seeing no reason to vacate Owens's convictions or sentence on the grounds that he has presented, we affirm.

## I.  BACKGROUND

### A. Factual Background

#### 1. The Home Invasion

In the early morning hours of December 18, 2014, at approximately 2:45 a.m., Carol Chabot ("Carol") awoke to a shuffling noise coming from the downstairs of her two-story house in Saco, Maine. Sensing something was not right, she woke her

husband, Steve Chabot ("Steve"), who lay beside her. Steve, however, did not hear the noise but told Carol "it's probably Rachel" who caused the noise — with "Rachel" being Rachel Owens ("Rachel"), a family friend who was staying the night. Then Steve rolled over to go back to sleep. Undeterred, Carol got out of bed to investigate.

As she walked down the upstairs hallway, toward the spare bedroom where Rachel was staying, Carol heard a second noise -- this time the loud sound of glass shattering. With haste, she looked into the spare bedroom and noticed Rachel was sound asleep in bed. Steve also heard the loud noise and hurried out of bed to check what was going on. He peeked out of his bedroom towards the staircase and saw an intruder racing up the stairs with a gun in his right hand. The intruder, later identified as Owens, was approximately 5 feet 9 inches tall with a slim, athletic build; he wore dark clothing, gloves, and a black mask with a single opening at the eyes and glasses protruding from it.

Steve shouted an expletive at the intruder and dashed back into the master bedroom. Carol, who did not see the intruder but saw a look of horror on her husband's face, ran into a third bedroom used as a home office and barricaded herself inside. The intruder followed her and tried to force his way into the room, but, after a few failed attempts, suddenly stopped. He then walked

toward the room where Rachel lay and fired at her three times, hitting her in the head, arm, and torso.

Having heard the gun shots, Steve peeked out of the master bedroom again.  He saw the intruder about two feet away, heading towards him.  They looked at each other face to face. Steve immediately slammed the door shut and held his arm against it.  Undaunted, the intruder kicked the door in, looked inside through the now slightly-opened doorway, and fired shots through the door, striking Steve in the arm, neck, and rib area.[1]  The intruder then abandoned the Chabot residence.  He did not take any valuables with him.

### 2.  The Crime Scene

In response to a 911 call from Steve Chabot received at 2:47 a.m., police arrived at the Chabot residence.  During their investigation of the crime scene, officers learned that the intruder gained entry into the garage through a door located in the back of the house, and into the interior of the Chabot residence through a door located in the garage that led to the kitchen.  The upper part of this garage door was double-paned glass, sectioned into nine squares by wood framing.  The intruder

---

[1] Both Rachel and Steve survived the incident, but it left Rachel with a bullet lodged in her brain and severely limited use of her right hand.

broke the outer pane of the lower left square of glass, leaving glass shards scattered on the floor and separating the inner pane, which remained intact, from the door, thereby creating a gap that allowed the intruder to reach in and unlock the deadbolt. Officers retrieved human hair from the area between the shattered outer pane of glass and the inner pane of glass, and swabbed the area for DNA.

Police officers also recovered numerous .9mm shell casings stamped "WCC 1987," later identified as 27-year-old Western Cartridge Company casings, from the second floor of the house.

Finally, while inspecting the periphery of the Chabot residence, officers found a footprint in the damp dirt outside the first-floor window near the garage and proceeded to make a cast of it.

### 3. Search, Intervention, and Interview

At around 5:00 a.m., Maine police officers informed New Hampshire law enforcement of the shooting at the Chabot residence. Two New Hampshire police officers, Randy Dyer ("Officer Dyer") and Keith Lee ("Officer Lee"), were instructed to visit Owens's residence in the town of Londonderry to verify the presence of his two vehicles. They were, however, instructed not to make contact with Owens.

At approximately 5:20 a.m., the two police officers arrived at Owens's neighborhood and parked their car at the beginning of Winthrop Road, the dead-end street where Owens's residence was located. Under the cover of darkness, they began heading down Winthrop Road toward the house. At around 5:24 a.m., before the officers could reach their destination, a state trooper patrol car with flashing blue lights drove near the Owens residence. Contemporaneously, a light visible from the house's front windows went off, making the inside of the house go dark. The officers stopped the trooper and instructed him to turn off the flashing lights. After this, the officers, now accompanied by the trooper, continued their approach towards the residence. With Officer Lee and the trooper providing cover, Officer Dyer eventually made his way into the driveway, where he placed his hand on Owens's Hyundai Santa Fe SUV ("Owens's vehicle") and noticed its hood and grill were warm.[2] The officers and trooper then retreated back down Winthrop Road to the staging area.

Several minutes after arriving at the staging area, the officers saw Owens's vehicle exit Winthrop Road and proceeded to

---

[2] Owens's vehicle was parked on the upper part of his driveway, with its nose facing the garage. The driveway is easily observable and accessible to anyone passing by in the neighborhood. It is not enclosed in any way, nor does it have any fences or signs warning visitors to stay away.

-6-

follow it.  The vehicle stopped at a nearby Circle K store, where Owens got out.  The officers approached Owens and told him that his wife had been shot.  Owens acted surprised and complained of chest pains, after which the officers requested medical attention for him.  While waiting for the medical personnel to arrive, the officers saw blood, a pair of boots with wet stains, and a computer hard drive inside Owens's vehicle.  Owens agreed to go with the officers to the police station for a videotaped interview (the "police interview") after receiving medical assistance.

During the police interview, Owens provided a detailed account of his night.  Specifically, he explained, albeit with some variation, that, after speaking to his wife Rachel at around 9:15 p.m., he went to bed, but got up a few times to work on his computer on a proposal for a military consultancy contract with the Ukrainian government that was due the next day.  In particular, Owens claimed that at around 2:30 a.m. -- fifteen minutes before the Chabot residence was broken into -- he sent an e-mail to one of his colleagues regarding a tweak to the proposal.

Owens also admitted to leaving his home on multiple occasions throughout the course of the night and early morning: first, to Circle K at around 12:30 a.m. to get a soda and cigarettes; then, to Dunkin' Donuts between 4:15-4:45 a.m. to get coffee and donuts; and finally, to Circle K again at around

-7-

6:30 a.m. to grab another cup of coffee, at which point he came in contact with officers Dyer and Lee. Furthermore, he informed the interviewing officers that he was a military retiree and had what he described as an "arsenal" of weapons in his house. After collecting some evidence (e.g., DNA samples from his hands and mouth, clothes, etc.), the police released Owens from custody.

### 4. The Double-Life and Motive

To fully understand the motive behind Owens's crime, we must look back to the preceding decade. In 2005, Owens met Betsy Wandtke ("Wandtke"), a woman from Wisconsin, in a flight back from a hunters' rights convention, which they had both attended.[3] About three years later, their relationship turned into an affair. As the affair progressed, Owens and Wandtke began to spend more time together -- up to ten days a month. Owens considered Wandtke his "lover" and his "life." He represented to her that he was in the process of divorcing Rachel, which Wandtke was unable to independently confirm, given that it was not true. To partly explain his long absences when he was actually with Rachel in New Hampshire, Owens told Wandtke that his work as a military consultant required him to travel and take part in covert missions in places like Afghanistan.

---

[3] From the moment they met, Wandtke was aware of Owens's marriage.

While the affair continued, in or about 2011, Rachel began to develop early-onset dementia. The responsibility of having to care for her burdened Owens, but did not deter him from continuing his affair with Wandtke. Then, on December 3, 2014, the affair came to an abrupt end. Due to an inadvertent call from Owens's mobile phone, Wandtke discovered that Owens was leading a double-life -- his marriage with Rachel continued in regular course. Wandtke confronted Owens about it and told him their relationship was over.[4] After a failed attempt to convince Wandtke that she misunderstood the conversation she overheard, Owens promised Wandtke he was going to make it up to her.

A mere fifteen days after the breakup, the events at the Chabot residence unfolded. Furthermore, in the days following the shooting, Owens contacted Wandtke via e-mail and told her that he was being "targeted" because of his work and instructed her to "go dark" and not tell anyone about their relationship. Then, on December 31, 2014 -- thirteen days after the incident at the Chabot residence and with his wife still recovering from a gunshot wound

---

[4] Owens was with Wandtke in Wisconsin a little over a week before their breakup. They had plans to celebrate Thanksgiving together. Notwithstanding, the weekend before the holiday, Owens suddenly cancelled their plans, leaving Wisconsin for a supposed emergency covert mission in Afghanistan. Then, on December 3, 2014, Wandtke found out that Owens was not in Afghanistan, but rather with Rachel in New Hampshire, as the result of the accidental call made from Owens's cell phone.

to the head -- Owens unexpectedly arrived at Wandtke's doorstep with a limousine and roses.  Owens and Wandtke celebrated New Year's Eve and spent time together during the first week of 2015. On January 4, 2015, Owens returned to New Hampshire.  Shortly thereafter, on January 11, 2015, Owens was arrested.

## B. Procedural Background

On March 11, 2015, a grand jury indicted Owens on two counts: interstate domestic violence (Count One) and discharge of a firearm during and in relation to a crime of violence (Count Two).  On July 6, 2015, Owens filed a motion to dismiss the indictment on double jeopardy grounds; a motion to suppress evidence gathered as the result of the entry into his property, namely, into his driveway; and, a motion to suppress search warrants issued and executed during the investigation for his vehicles and house, electronic items (e.g., an iPhone, Magellan GPS, etc.), and an external hard drive and a laptop computer in a Swiss Army case.[5]  The district court held an evidentiary hearing

---

[5]  Owens also moved to suppress DNA evidence obtained from a blood sample collected at the Chabot residence, and from a buccal swab law enforcement performed on his cheeks during the police interview.  Owens, however, eventually withdrew his motion as to the blood sample collected from the Chabot residence. Notwithstanding, we note that a heading in his brief makes specific reference to the collection of the blood sample, which may be interpreted to suggest his intent to still seek suppression of the DNA test results obtained therefrom.  The Government attributes Owens's reference to the collection of the blood sample in the heading to human error.  It asserts that the section with this

on Owens's motion to dismiss and motions to suppress. Evidence was presented, including the testimony of the officer who touched Owens's vehicle, as well as that of the officers who drafted the affidavits on which the search warrants were based. Unpersuaded, the district court denied Owens's motions to dismiss and to suppress.

A ten-day jury trial followed. The jury found Owens guilty of both counts. For these charges, the district court sentenced Owens to life imprisonment (240 Months on Count One and Life on Count Two). Owens timely appealed.

## II. <u>ANALYSIS</u>

### A. Motion to Suppress Evidence Gathered as a Result of Officer Dyer's Entry into the Driveway

We review a district court's denial of a motion to suppress scrutinizing its factual findings for clear error and its legal conclusions <u>de novo</u>. <u>United States</u> v. <u>Flores</u>, 888 F.3d 537, 543 (1st Cir. 2018) (citations omitted); <u>United States</u> v. <u>Brown</u>,

---

heading actually deals with Owens's challenge to a search warrant affidavit that mentions DNA evidence obtained from Owens's police interview buccal swab. <u>See</u> <u>infra</u> at 21-24. Based on the section's content, we agree. Neither there nor anywhere else in his brief does Owens develop an argument for suppression of the DNA test results obtained from the collection of a blood sample at the Chabot residence. Accordingly, Owens must "forever hold [his] peace" with the Government's use of this evidence. <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) (citations and internal quotation marks omitted).

510 F.3d 57, 64 (1st Cir. 2007).  To succeed on appeal, a defendant "must show that no reasonable view of the evidence supports the district court's decision."  United States v. Dunbar, 553 F.3d 48, 55 (1st Cir. 2009) (citations and internal quotation marks omitted).

Owens argues that Officer Dyer's entry into his driveway and touching of his vehicle parked therein constituted an illegal search because the driveway formed part of his house's curtilage and, therefore, was protected from warrantless searches by the Fourth Amendment.  Accordingly, he sustains that the district court erred in denying the suppression of evidence obtained as a result of the search, namely, any reference to the temperature of his vehicle's hood and grill.

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "When the Government obtains information by physically intruding on persons, houses, papers, or effects, a search within the original meaning of the Fourth Amendment has undoubtedly occurred."  Florida v. Jardines, 569 U.S. 1, 5 (2013) (citations and internal quotation marks omitted).

For Fourth Amendment purposes, a house's curtilage is "the area immediately surrounding and associated with the home."

-12-

Id. at 6 (citation and internal quotation marks omitted). "The protection afforded [to a house's] curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." California v. Ciraolo, 476 U.S. 207, 212–13 (1986). Therefore, "[w]hen a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred. . . . Such conduct thus is presumptively unreasonable absent a warrant." Collins v. Virginia, 138 S. Ct. 1663, 1670 (2018) (citation omitted).

In determining whether a specific part of a house falls within its curtilage, we consider:

> [1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to protect the area from observation by people passing by.[6]

Brown, 510 F.3d at 65 (alterations in original) (quoting United States v. Diehl, 276 F.3d 32, 38 (1st Cir. 2002) (quoting United States v. Dunn, 480 U.S. 294, 301 (1987))). In the instant case,

---

[6] These factors are eponymously called the Dunn factors after the Supreme Court's seminal opinion in United States v. Dunn, 480 U.S. 294 (1987). See, e.g., United States v. Bain, 874 F.3d 1, 14 (1st Cir. 2017).

-13-

however, we need not address these factors given that, even assuming that the driveway formed part of the house's curtilage, Officer Dyer faced exigent circumstances when he entered the driveway and placed his hand on Owens's vehicle, which circumscribes his warrantless search within the bounds of the Fourth Amendment. We explain.

Although generally a warrant must be secured before searching a home and its curtilage, "the warrant requirement is subject to certain reasonable exceptions." Kentucky v. King (King), 563 U.S. 452, 459 (2011) (citation omitted). These exceptions are born out of courts' need to "balance the privacy-related and law enforcement-related concerns to determine if the intrusion was reasonable" under the Fourth Amendment. Maryland v. King, 569 U.S. 435, 448 (2013) (quoting Illinois v. McArthur, 531 U.S. 326, 331 (2001)). "One well-recognized exception applies when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment.'" King, 563 U.S. at 460 (quoting Mincey v. Arizona, 437 U.S. 385, 394 (1978); see also Birchfield v. North Dakota, 136 S. Ct. 2160, 2173 (2016) ("The exigent circumstances exception allows a warrantless search when an emergency leaves police insufficient time to seek a warrant." (citing Michigan v. Tyler, 436 U.S. 499, 509 (1978))).

-14-

This exception, commonly known as the "exigent circumstances exception," has been applied in instances where the "need 'to prevent the imminent destruction of evidence'" justifies a warrantless search. King, 563 U.S. at 460 (citing Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006)).

In determining whether exigent circumstances justify a warrantless search, we examine the totality of the circumstances. Missouri v. McNeely, 569 U.S. 141, 149 (2013). Accordingly, in the present case we begin by considering the gravity of the crime being investigated and the weather conditions at the time of the search to ascertain the constitutionality of Officer Dyer's actions. Officer Dyer was investigating a crime of the most serious nature, a potential double-homicide, on a cold December morning. See Welsh v. Wisconsin, 466 U.S. 740, 753 (1984); United States v. Veillette, 778 F.2d 899, 902 (1st Cir. 1985) (listing the "gravity of the underlying offense" as one of the factors that courts must consider "[i]n determining whether the circumstances of a case fall into one of the emergency conditions characterized as exigent circumstances"). As conceded by Owens's counsel at oral argument, the temperature in Londonderry, New Hampshire at the time of the search was 30 degrees Fahrenheit. In this cold weather, it was reasonable for Officer Dyer to believe that any warmth emanating from the vehicle -- the evidence -- would evanesce

or be destroyed before he could obtain a search warrant.

It is not unprecedented to make a finding of exigency based on a naturally occurring event's destructive consequence over critical evidence. In McNeely, the Supreme Court recognized that the "the natural dissipation of alcohol in the blood may support a finding of exigency in . . . specific case[s]." 569 U.S. at 156. Such was the case in Schmerber, where the Court concluded that "further delay in order to secure a warrant after the time spent investigating the scene of the accident and transporting the injured suspect to the hospital to receive treatment would have threatened the destruction of evidence" given that it would have "negatively affect[ed] the probative value of the [blood alcohol test] results." McNeely, 569 U.S. at 152 (citing Schmerber v. California, 384 U.S. 757, 770-71 (1966)).

We do not find it difficult to draw parallels between the exigent circumstances found in Schmerber and those in the instant case. Unlike other "destruction-of-evidence cases" in which a "suspect has control over easily disposable evidence," here, like in Schmerber, law enforcement dealt with the type of "evidence [that]. . . naturally dissipates over time in a gradual and relatively predictable manner." Id. at 153. Just as the passing of time negatively affected the probative value of the blood-alcohol test in Schmerber, it negatively affected the

probative value of Officer Dyer's gauging of the temperature of Owens's vehicle through his sense of touch, and, as such, threatened the destruction or loss of evidence. See id. at 152.

The natural dissipation of the vehicle's heat, however, was not the only way the evidence could have been lost in the present case. If Owens turned on his vehicle's engine, as he eventually did, the evidence would have likewise been destroyed. Ignition would have made it practically impossible for law enforcement to know, based on touch, whether the vehicle was previously warm. In deciding whether to enter the driveway and touch Owens's vehicle, Officer Dyer was "forced to make [a] split-second judgment[] -- in circumstances that [were] tense, uncertain, and rapidly evolving." United States v. Almonte-Báez, 857 F.3d 27, 31 (1st Cir. 2017) (quoting King, 563 U.S. at 466).[7] Because a light inside Owens's house was shut off a few minutes before his entry into the driveway, Officer Dyer had an objectively reasonable basis to believe Owens was awake and therefore capable of exiting his house and turning on his vehicle at any moment, thereby destroying the evidence. These circumstances, considered

---

[7] Apart from knowing that Owens was being investigated in relation to a double-shooting, officers Dyer and Lee were aware that Owens had a military background and possessed firearms in his house. Also, they did not want to be seen because their instructions were to verify the presence of Owens's vehicles without making contact with him.

in conjunction with the inevitable natural dissipation of the
vehicle's warmth, support a finding of exigency and, thus, of
reasonableness as to Officer Dyer's search. See Almonte-Báez, 857
F.3d at 32 ("[T]he government . . . may invoke the exigent
circumstances exception when it can identify an 'objectively
reasonable basis' for concluding that, absent some immediate
action, the loss or destruction of evidence is likely." (citation
omitted)).

Finally, the scope and intrusiveness of Officer Dyer's
search also weigh in favor of its reasonableness. See Maryland v.
King, 569 U.S. at 448 ("Th[e] application of 'traditional standards
of reasonableness' requires a court to weigh 'the promotion of
legitimate governmental interests' against 'the degree to which
[the search] intrudes upon an individual's privacy.'" (quoting
Wyoming v. Houghton, 526 U.S. 295, 300 (1999))). The scope of
Officer Dyer's search was limited to verifying the temperature of
Owens's vehicle, and its intrusiveness was minimal -- Officer Dyer
simply placed his hand on the vehicle's hood and grill for a few
seconds. Cf. Schmerber, 384 U.S. at 770-72 (holding that drawing
a drunk-driving suspect's blood was reasonable); Cupp v. Murphy,
412 U.S. 291, 296 (1973) (holding that the "ready destructibility
of the evidence" and the suspect's observed efforts to destroy it
"justified the police in subjecting him to the very limited

-18-

search," the scraping of his fingernails, which was "necessary to preserve the highly evanescent evidence they found under his fingernails"); Nikolas v. City of Omaha, 605 F.3d 539, 546 (8th Cir. 2010) (holding that the exterior search of a garage, which warrants "protection comparable to that afforded the curtilage of a residence," by "look[ing] through the windows was constitutionally reasonable").

In short, based on our fact-bound and case-specific inquiry, we conclude that Officer Dyer's warrantless search of Owens's vehicle while parked in his house's driveway did not offend the Fourth Amendment because, within the totality of the circumstances, it was objectively reasonable for Officer Dyer to believe the search was necessary to prevent the imminent destruction of evidence.[8]

---

[8] Even if we were to find that the district court erred in denying Owens's motion to suppress evidence referencing the temperature of his vehicle, we would deem such error harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24 (1967); see also Chambers v. Maroney, 399 U.S. 42, 53 (1970). As discussed in detail below, the Government presented a plethora of evidence unrelated to the temperature of Owens's vehicle that provided a more than compelling basis for Owens's convictions. See infra at 26-29; see also United States v. Jiménez, 419 F.3d 34, 42 (1st Cir. 2005) (finding harmless error when erroneously admitted evidence "pale[d] in light of the other evidence introduced at trial").

By the same token, the very limited evidence regarding the temperature of Owens's vehicle was inconsequential and cumulative. See Harrington v. California, 395 U.S. 250, 254 (1969) (recognizing that cumulative nature of contested evidence is a factor that

**B.  Motion to Suppress the Search Warrants**

During the investigation of Owens's crimes, a total of five search warrants were issued.[9]  On appeal, Owens argues that the district court erred in denying his motion to suppress the evidence seized pursuant to all the warrants, albeit on two different grounds.  He challenges the first four warrants arguing that the affidavits on which they were based contained false or misleading information.[10]  Specifically, Owens sustains that these

contributes to the conclusion that any error in admitting the evidence was harmless).  To the extent that the warmth emanating from Owens's vehicle was probative, it served to suggest that his vehicle had been recently used.  But it was essentially conceded that Owens had left his house and driven his vehicle in the hours surrounding the incident at the Chabot residence.  Owens himself testified that he left his house multiple times that night and early morning.  Still more, video surveillance footage placed him outside of his house and at Dunkin' Donuts not long after the time of the incident.  Unsurprisingly, in its closing statement the Government did not once meaningfully refer to the temperature of Owens's vehicle.

Thus, viewed in context, the evidence that Owens's vehicle felt warm when Officer Dyer touched it was simply unessential to both the Government's case and the jury's guilty verdicts.  See United States v. Hasting, 461 U.S. 499, 506 (1983) ("Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since by definition, the conviction would have been obtained notwithstanding the asserted error.").

[9]  Two state courts, New Hampshire's Salem Circuit Court and Maine's Biddeford District Court, and the United States District Court for the District of Maine issued the search warrants Owens challenges on appeal.

[10]  In his brief, Owens also posits that the district court erred because on their face the search warrant affidavits did not support

four affidavits contain certain misstatements, omissions, and inconsistencies that affected the issuing judges' probable cause determinations. Owens challenges the fifth warrant to the extent its supporting affidavit relied on: (1) evidence seized pursuant to one of the four prior "faulty warrants," or (2) the match between DNA collected from the crime scene and the DNA obtained from the buccal swab taken during the police interview, which Owens avers was obtained "due to [his] uninformed and/or involuntary consent." On these grounds, Owens contends that we should invalidate the warrants or, in the alternative, remand to the district court for a hearing to "fully determine the depth and breadth" of the purported inaccuracies. We disagree.

Affidavits supporting search warrants are presumptively valid. United States v. Barbosa, 896 F.3d 60, 67 (1st Cir. 2018); United States v. McLellan, 792 F.3d 200, 208 (1st Cir. 2015). A defendant may "rebut this presumption and challenge the veracity" of a warrant affidavit at a pretrial hearing commonly known as a Franks hearing. Barbosa, 896 Fd.3d at 67 (quotation and citations omitted); see also Franks v. Delaware, 438 U.S. 154, 171 (1978).

---

a finding of probable cause and did not establish a nexus between the locations to be searched and the items sought. Owens, however, does not support this argument with anything more than conclusory statements. Accordingly, we deem it waived on appeal. Zannino, 895 F.2d at 17 (citations omitted).

To be entitled to a <u>Franks</u> hearing, however, a defendant must first make two "substantial preliminary showings: (1) that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth; and (2) the falsehood or omission was necessary to the finding of probable cause." <u>United States</u> v. <u>Rigaud</u>, 684 F.3d 169, 173 (1st Cir. 2012) (citation and internal quotation marks omitted).[11] A defendant's "failure to make a showing on either of these two elements dooms [his] challenge." <u>McLellan</u>, 792 F.3d at 208.

In its order denying Owens's motion to suppress the evidence obtained pursuant to the search warrants, the district court made a detailed assessment of Owens's claims as to each misstatement and omission he identified in the affidavits. Order on Def.'s Mots. to Suppress and Dismiss, <u>United States</u> v. <u>Owens</u>, No. 2:15-CR-55-NT, 2015 WL 6445320, at *12-18 (D. Me. Oct. 23, 2015). In doing so, the district court concluded that Owens did not make a showing of the two required elements -- intentionality and materiality -- for any single misstatement or omission contained in the affidavits. <u>Id.</u> Specifically, it found that the misstatements and omissions were either the result of negligence

---

[11]  These showings are referred to as the "intentionality" and "materiality" prongs of the <u>Franks</u> test. <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Lull</u>, 824 F.3d 109, 113-14 (4th Cir. 2016).

or innocent mistakes, or had no bearing on the probable cause determinations.[12] Id. As to Owens's contention regarding his lack of consent to the buccal swab during the police interview, the district court reviewed video recordings of the interview and concluded that Owens's consent "was voluntarily given, and not the result of duress or coercion, express or implied." Id. at *3 n.2 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973)).

After a careful analysis of the record, we agree with and adopt the district court's factual findings and legal conclusions regarding Owens's failure to make the intentionality and materiality showings that would entitle him to a Franks hearing, and Owens's consent to the buccal swab during the police interview. Accordingly, we find no error in the district court's denial of Owens's motions to suppress the evidence seized pursuant to the search warrants. See United States v. Arias, 848 F.3d 504, 511 (1st Cir. 2017) ("In considering a district court's decision to deny a Franks hearing, we review factual determinations for

---

[12] We note that, in support of his motion to suppress, Owens even labelled as "recklessly false" statements that were actually true. For example, Owens argued that one of the affidavits falsely identified him as a suspect, but Owens was in fact a suspect at the time the affidavit was submitted. The same goes for some of the omissions on which Owens's motion rested. For example, he claimed that one of the affidavits omitted that the Chabot residence's intruder first attempted to gain entry into the room where Carol was hiding, when the affidavit specifically mentioned this fact.

clear error and the probable cause determination de novo." (citation omitted)); see also United States v. Tzannos, 460 F.3d 128, 136 (1st Cir. 2006) (recognizing that "a defendant must meet a high bar even to get a Franks hearing").

## C. Sufficiency of Evidence for Owens's Convictions

In reviewing sufficiency challenges, "[w]e view 'all [the] evidence, credibility determinations, and reasonable inferences therefrom in the light most favorable to the verdict[] in order to determine whether the jury rationally could have found that the government established each element of the charged offense beyond a reasonable doubt.'" United States v. Valdés-Ayala, 900 F.3d 20, 30 (1st Cir. 2018) (quoting United States v. Serunjogi, 767 F.3d 132, 139 (1st Cir. 2014)). Our analysis "is weighted toward preservation of the jury verdict." Rodríguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 57 (1st Cir. 2005). "[A]s long as the guilty verdict finds support in a 'plausible rendition of the record,' it must stand." United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002) (citation omitted). Importantly, as we conduct our review, we place "no premium . . . upon direct as opposed to circumstantial evidence" since "both types of proof can adequately ground a conviction." United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995) (quoting United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992)).

For Owens's conviction on Count One, interstate domestic violence, the jury must have found that the Government proved beyond reasonable doubt that: (1) Owens was married to Rachel; (2) Owens traveled in interstate commerce -- in this case, from New Hampshire to Maine -- with the intent to "kill [or] injure" Rachel; (3) "as a result of such travel," Owens "commit[ted] or attempt[ed] to commit a crime of violence" against Rachel; and (4) a "life threatening bodily injury" resulted from Owens's actions.[13]  18 U.S.C. § 2261(a)(1) & (b)(2).  Meanwhile, for Owens's conviction on Count Two, discharge of a firearm during and in relation to a crime of violence, the Government had to prove that "during and in relation to [a] crime of violence," namely the crime of interstate domestic violence charged in Count One, Owens knowingly "use[d] . . . a firearm" by discharging it "during and in relation" to the commission of that crime.  18 U.S.C. § 924(c)(1)(A)(iii).

Owens's sufficiency challenge rests on the Government's alleged failure to prove that Owens was the person who intruded

---

[13]  The Government sought to prove the fourth prong, that Rachel sustained a "life threatening bodily injury," for purposes of 18 U.S.C. § 2261(b)(2), which provides a penalty of up to 20 years' imprisonment if defendant's commission of interstate domestic violence under § 2261(a) results in "permanent disfigurement or life threatening bodily injury to the victim."  18 U.S.C. § 2261(b)(2).

into the Chabot residence, and the purported impossibility of Owens travelling from Londonderry to Saco, invading the Chabot residence, and returning to Londonderry within a time frame of approximately four hours and twenty-four minutes. Owens claims that neither Carol, Steve, nor Rachel identified him as the intruder. Furthermore, Owens stresses that Rachel identified the intruder as a "dark skinned person with dread locks [sic]," which does not match his physical description since he is a "white male who does not have dread locks [sic]." As to the second ground of his sufficiency challenge, Owens claims that, because he was present in Londonderry at 12:11 a.m. and 4:35 a.m., as reflected by two store's video surveillance footage, it was impossible for him to have been present in Saco when the shooting took place, 2:45-2:47 a.m. He focuses on the amount of time it would have taken him to make the trip back from Saco to Londonderry. In particular, Owens contends that a trip from the Chabot residence in Saco to Londonderry would take him at least two hours and fifteen minutes, while under the Government's theory it took him approximately one hour and forty-eight minutes. We are not persuaded.

As the Government avers, the jury was presented a vast amount of direct and circumstantial evidence identifying Owens as the Chabot residence intruder. Specifically, the Government

identifies the following incriminating evidence presented at trial: (1) laboratory testing confirming that Owens's DNA was found in an area where the two window panes had been affixed to each other -- an area that would not have been exposed until the intruder shattered the outer pane -- as well as in the door handle and deadlock used to access the Chabot residence; (2) boot prints and a cast of boot impression taken from the scene that matched the boots found in Owens's car a few hours after the incident; (3) testimony regarding bloodstains found on the armrest of the driver's door and inside the driver's door of Owens's vehicle a few hours after the incident; (4) Steve's testimony identifying the intruder as a person with a similar physique to Owens's and who, like Owens, wore glasses; (5) expert testimony revealing Owens's efforts to manipulate his laptop's clock to make it seem that he was at his Londonderry home at the time of the incident; and, relatedly, (6) testimony regarding Owens's attempt to manufacture an alibi by having his former boss lie to law enforcement about a Skype call that never took place. This evidence, in conjunction with the rest of the evidence presented at trial, allows a reasonable jury to conclude beyond reasonable doubt that it was Owens who broke into the Chabot's residence.[14]

---

[14] Although not specifically listed by the Government as evidence that led the jury to identify Owens as the Chabot residence's intruder, we note that the .9mm ammunition stamped "WCC 1987" and

Owens's reference to Rachel's alleged identification of the intruder as a "dark skinned person with dread locks [sic]," which we read as an attempt to highlight evidence of exculpatory nature, does not help him.  We are not to "weigh the evidence or make credibility judgments" in our sufficiency review, as "these tasks are solely within the jury's province." Serunjogi, 767 F.3d at 139 (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)).[15]

Finally, as to the alleged impossibility of Owens making the trip back from Saco to Londonderry in less than two hours and fifteen minutes, the jury was presented with ample testimonial evidence, including Owens's own trial testimony, reflecting that this ninety-mile trip usually took about one hour and thirty minutes.  Moreover, Carol testified that Owens frequently bragged about making the trip in just over an hour.  Accordingly, the jury was presented with sufficient evidence to conclude that Owens's Londonderry-Saco roundtrip would have lasted three hours or less,

---

dark clothes seized from Owens's house also strongly support the jury's guilty verdicts.  The .9mm ammunition casings matched the shell casings recovered from the Chabot residence, while the dark clothes, some of which was found in Owens's washing machine, matched that worn by the residence's intruder.

[15]  In any event, we note that the record is devoid of any testimony describing the intruder as such.  What Rachel did testify was that the intruder was wearing a "Jamaican hat" or "floppy [black] hat."

which fits easily within the four hour and twenty-four-minute window separating the two instances in which he was recorded at the Londonderry stores.

Based on the foregoing analysis, we conclude that there was sufficient evidence to support Owens's convictions.

**D. Reasonableness of Owens's Life Sentence**

Owens challenges the procedural and substantive reasonableness of his sentence. He claims the district court erred procedurally by not considering some factors outlined in 18 U.S.C. § 3553, and that it substantively erred in imposing a life sentence.

Our review is bifurcated. First, we ensure the district court did not commit any procedural errors, such as "failing to consider the section 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." United States v. Gierbolini-Rivera, 900 F.3d 7, 12 (1st Cir. 2018) (citation omitted). If a sentence is procedurally sound, we proceed to the second step of our inquiry: determining whether the sentence is substantively reasonable. Id. In reviewing the substantive reasonableness of a sentence, we "focus[] on the duration of the sentence in light of the totality of the circumstances." Id. (citing United States v. Del Valle-Rodríguez, 761 F.3d 171, 176 (1st Cir. 2014)). Although a district

court is "under a mandate to consider a myriad of relevant factors," the weight it decides to afford to those factors is "largely within the court's informed discretion." United States v. Clogston, 662 F.3d 588, 593 (1st Cir. 2011); see also 18 U.S.C. § 3553(a).  We will ultimately find a sentence substantively reasonable "so long as the sentencing court has provided a 'plausible sentencing rationale' and reached a 'defensible result.'" Gierbolini-Rivera, 900 F.3d at 12 (citing United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008)).[16]

Because Owens failed to preserve his objection below, we review his procedural challenge based on the district court's alleged failure to consider § 3553(a) factors for plain error. Id. at 13.  Hence, for Owens's procedural challenge to succeed, he must show: "(1) that an error occurred, (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. at 12 (citations

---

[16]  In considering a challenge to the substantive reasonableness of a sentence preserved below, this court applies the abuse of discretion standard. Gierbolini-Rivera, 900 F.3d at 14. Owens, however, did not object to his life sentence below. In such cases, it remains an open question in this Circuit whether the abuse of discretion standard or the plain error standard applies. Id. at 15 (citation omitted). Notwithstanding, we need not decide this issue in the instant case given that Owens's claim fails under both.

omitted).

Owens's procedural challenge to his sentence fails on the first prong of the plain error test. The record reveals that the district court took into consideration all the mitigating factors Owens claims it did not, namely, his military accolades, lack of criminal history, productive work history, and age. See 18 U.S.C. § 3553(a) (stating that a sentencing court "shall consider . . . the history and characteristics of the defendant"). The district court, however, weighed these mitigating factors against the following aggravating factors: the severity of the crime; Owens's premeditation, given that he planned to kill Rachel both to avoid the responsibility of caring for her as she suffered from dementia and to be able to continue his affair, while avoiding the scorn that divorcing Rachel would have caused; the attempted murder of a witness and friend, Steve, to prevent him from identifying Owens as the intruder; Owens's deceitful character, as revealed through his participation at trial and during allocution; and, finally, the need to protect the public, among others. See id. This balancing of sentencing factors "is precisely the function that a sentencing court is expected to perform," United States v. Ledée, 772 F.3d 21, 41 (1st Cir. 2014) (citation omitted), and we find that the district judge did not procedurally err, plainly or otherwise, while carrying it out in the present

case.

Further, the district court thoroughly explained the
rationale behind Owens's life sentence. Apart from the factors
listed above, it emphasized Owens's "cold-blooded behavior . . .
[and] obvious lack of conscience," as well as the "long lasting
emotional damage to both Chabots" and the severity of the injuries
inflicted on Rachel. Considering the totality of the
circumstances of Owens's crime, we find that the district court's
life sentence is a defensible result. See Gierbolini-Rivera, 900
F.3d at 12. Accordingly, we conclude that the district court did
not substantively err.

**E. Motion to Dismiss the Indictment on Double Jeopardy Grounds**

Finally, Owens claims that the district court erred in
denying his motion to dismiss the indictment on double jeopardy
grounds. The Double Jeopardy Clause "provides that no person may
be tried more than once 'for the same offence.'" Currier v.
Virginia, 138 S. Ct. 2144, 2149 (2018). It protects "an individual
against (1) a second prosecution for the same offense, following
an acquittal; (2) a second prosecution for the same offense,
following a conviction; and (3) multiple punishments for the same
offense." United States v. Stoller, 78 F.3d 710, 714 (1st Cir.
1996) (citation omitted). Owens, however, does not establish that
his double jeopardy challenge is premised on a prior criminal

conviction, acquittal, or punishment for the same offenses for which he was convicted and sentenced in this case.[17] We thus find no error in the district court's denial of his motion to dismiss the indictment on double jeopardy grounds.

### III. __CONCLUSION__

For the reasons explained above, each of Owens's claims is unavailing. We therefore affirm the district court's denial of his pretrial motions, his convictions, and sentence.

**__Affirmed.__**

---

[17] He does not even allege that he was subject to any prior criminal prosecution for offenses resulting from the events that unfolded at the Chabot residence.